**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **Linda Guzzo,** : | |
| : | |
| **Plaintiff** : | |
| : | |
| v. : | |
| : | |
| **Connecticut State Colleges and** : | |
| **Universities, State of Connecticut** : | |
| : | **February 26, 2021** |
| **Defendant** : | |

**COMPLAINT**

I. **INTRODUCTION**

1. The plaintiff, Linda Guzzo, brings this action against her employer, the defendant, Connecticut State Colleges and Universities (CSCU), an agency of the State of Connecticut. The plaintiff includes in her Complaint the following legal claims:

*Counts One and Two*, alleging employment discrimination in violation of the federal Age Discrimination in Employment Act (ADEA), 29 U.S.C. §621 *et seq.,* and alleging retaliation for opposing a discriminatory employment practice in violation of the ADEA, 29 U.S.C. §623(d).

*Counts Three and Four*, alleging employment discrimination on account of age in violation of the Connecticut Fair Employment Practices Act (CFEPA), Conn.Gen.Stat. §46a-60, *et seq*., and alleging retaliation for opposing a discriminatory employment practice in violation of the CFEPA, Conn.Gen.Stat. §46a-61(a)(4).

*Count Five*, alleging discrimination and/or retaliation in employment because the plaintiff exercised rights under the Family and Medical Leave Act, 29 U.S.C. §2615(a)(2) and §2615(b).

2.     The plaintiff seeks to be made whole, including by promotion to a position in defendant's employ that she would have received but for the defendant's discriminatory and/or retaliatory conduct; the plaintiff also seeks as damages any and all lost wages and benefits of employment; compensatory damages for her pain, suffering, and emotional distress; double or liquidated damages for willful violation of the plaintiff's rights; and her reasonable attorney's fees and costs.

## II.    JURISDICTION AND VENUE

3.     This Court has jurisdiction pursuant to 28 U.S.C. §1331. With respect to the state law claims, this Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 in that the state law claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

4.     Venue is appropriate in the District of Connecticut pursuant to 28 U.S.C. §1391(b), because a substantial part of the events giving rise to his claim occurred within this judicial district.

## III.   ADMINISTRATIVE PROCEEDINGS

5.     On or about December 3, 2019, plaintiff filed an administrative complaint with the Connecticut Commission on Human Rights and Opportunities and the Equal Employment Opportunities Commission alleging, *inter alia*, that she had suffered discrimination in employment on account of her age. On or about November 2, 2020, plaintiff filed an amended complaint stating additional allegations and alleging discrimination in employment on account of her age and retaliation for having opposed an unlawful employment practice.

6.     On or about December 3, 2020, the Connecticut Commission on Human Rights and Opportunities issued a release of jurisdiction as to the plaintiff's administrative complaint

of age discrimination and retaliation. On or about December 18, 2020, the Equal Employment Opportunities Commission issue a Right to Sue letter in connection with the plaintiff's administrative complaint of age discrimination and retaliation.

## IV. PARTIES

7. The plaintiff, Linda Guzzo, is a person residing at 26 Paxton Road, West Hartford Connecticut.

8. The plaintiff is a woman; her date of birth is December 2, 1958.

9. The defendant is Connecticut State Colleges and Universities (CSCU) an agency of the State of Connecticut, with a principal place of business at 61 Woodland Street, Hartford, Connecticut.

10. The defendant is, at all times relevant to this Complaint, an employer subject to the requirements of the Age Discrimination in Employment Act; the Civil Rights Act of 1964, as amended; the Connecticut Fair Employment Practices Act; and the federal Family and Medical Leave Act.

11. The plaintiff has been employed by the defendant from in or about 1984 to the present.

## V. FACTS

12. Over the course of the plaintiff's employment by the defendant, she has held the positions of Director of Continuing Education Business Programs; Coordinator, Business & Industry Services; Director of Business & Industry Services; Interim Associate Dean of Continuing Education; Associate Dean of Continuing Education; and Dean of Workforce Development & Continuing Education.

13. Throughout the plaintiff's employment by the defendant, she has consistently performed the duties of her position at or above the reasonable expectations of her supervisors, including for a time performing the duties of two long term vacant director positions in addition to her position as Dean, with no additional compensation.

14. Beginning in or about 2018, the plaintiff reported to Duncan Harris, Interim Campus Chief Executive Officer for Capital Community College and subsequently Campus Chief Executive Officer for Capital Community College, as part of his "Cabinet" of direct reports.

15. The plaintiff was the oldest of the five management employees who were Harris's direct reports comprising the Cabinet.

16. From the time that the plaintiff began reporting to Harris, he and/or Josephine Agnello-Veley, defendant's Director of Human Resources for Capital Community College (and also a member of Harris's "Cabinet") made repeated inquiries to the plaintiff about her retirement plans.

17. In response to these inquiries, the plaintiff repeatedly stated to Harris and to Agnello-Veley that she had no plans to retire, but was looking for promotional opportunities.

18. Defendant has a history of placing individuals into "interim" positions in order to delay conducting searches. The delay provides temporary promotional opportunities, increased compensation, and advantages to incumbents when searches are conducted to permanently fill positions.

19. In or about May and June 2018, the plaintiff was passed over for appointment to the position of Interim Academic Dean of Capital Community College.

20. Harris told the plaintiff that if she applied for the position, she would not be considered because she was "near retirement."

21. Younger, less-qualified employees were appointed to those positions.

22. Plaintiff has limitations to her mobility because of a workplace injury. Beginning in or about May 2019, on several occasions where Harris and his "Cabinet" attended off-campus events, plaintiff's physical limitations were not considered. Plaintiff had to draw attention to herself by using an elevator rather than stairs, had difficulty walking the long distances to the locations, and using high rise collaborative seating as required by Harris as part of "team building".

23. On a number of occasions another Cabinet member commented on plaintiff's "white sneakers," an age-based stereotype. Harris ratified and did not challenge his subordinate's ageist comments.

24. At monthly Cabinet meetings, Harris and/or Agnello-Veley circulated lists of employees who they considered to be at or near retirement age.

25. Harris frequently referred to or introduced plaintiff as his oldest manager.

26. In or about May and June 2019, plaintiff was passed over for the permanent appointment to Academic and Student Services Dean for Capital Community College. Harris told the plaintiff that if she applied for the position, she would not be considered because she was "near retirement."

27. In or about July 2019, during a meeting of Duncan Harris with his immediate reports, he praised the younger members of the Cabinet with comments such as "Miah you will become a president. Jason you will earn your doctorate. Josephine you will teach."

5

28. Harris' comment about the plaintiff was that she would be walking out with a walker, and he proceeded to physically mimic the plaintiff walking out the door with a walker.

29. In or about August 2019, prior to the opening of the defendant's Leadership, Excellence, Achievement and Development (LEAD) Center, a project that plaintiff designed and initiated, Harris told plaintiff that she would not be speaking at the opening and that he would orchestrate photographs of the opening to exclude plaintiff because he wanted the LEAD Center to present a "young" image.

30. In or about September 2019, with respect to an incident involving a threat of workplace violence against the plaintiff by another employee, the defendant failed to follow its own procedures, including by failing to keep plaintiff informed about steps it should have taken to ensure her safety.

31. The defendant's handling of the threat of violence directed toward the plaintiff was intended to encourage her to quit or retire.

32. Text from Duncan Harris regarding a photo with external business partners in August 2019 did not portray the plaintiff positively due her age.

33. Beginning in or about September 2019, while plaintiff was on an approved FMLA leave of absence, in a meeting with plaintiff's staff, Harris announced his intention to intercept all of plaintiff's email, mail, and calls.

34. Beginning in or about September 2019, while plaintiff was on an approved FMLA leave of absence, Harris moved plaintiff's office to a less secure location that was more remote from her colleagues and cut off plaintiff's communications with the Cabinet, campus staff and faculty, plaintiff's own staff, and external partners.

35. Beginning in or about September 2019, while plaintiff was on an approved FMLA leave of absence, Harris falsely informed external partners that they were not to communicate with plaintiff because she was retiring and/or otherwise not returning to work.

36. Harris also removed plaintiff from the Cabinet group texts which was the standard form of communication among his management team.

37. Due to Harris's actions, while on FMLA the plaintiff received no communications from the Cabinet even for informational purposes.

38. When the plaintiff returned to work, she discovered that her office had been relocated and all of her files and personal belongings had been removed. Both Human Resources and Campus Security stated they were unaware of whether or where the plaintiff had been assigned to work.

39. Ultimately, plaintiff was assigned to an office she had previously occupied. The office was not ready for occupancy such that furniture had to be rearranged in order for the space to be usable, there was no working computer in the office, no heat and no security measures for the main door of the office, which was not visible by the plaintiff from her workspace.

40. Harris told plaintiff that some of her missing files might be located in an unused work area known as "the kitchen," and instructed her to clean out the work area.  Harris also instructed the plaintiff to clean out the office of another employee who retired while the plaintiff was on FMLA.

41.  Most of plaintiff's files and all of her personal belongings that had been removed from her office while she was on FMLA leave were never located or returned.

42. In 2020, Connecticut State Colleges & Universities accepted applications for three vacant positions for Chief Workforce Development Officer, including a position for the Capital-East Region, which includes Capital Community College.

43. Harris and Agnello-Veley interfered with the normal chain of communications that would have alerted plaintiff to the vacant positions, in order to prevent her from applying.

44. Nonetheless, plaintiff learned of the vacant positions and applied.

45. Although was the most experienced and qualified for the position, she was not selected for any of the vacant positions.

46. Plaintiff was the only Dean of Workforce Development and Continuing Education not selected for one of the executive level vacant positions. Diane Bordonaro, who held the position of Director of Continuing Education (a subordinate position with no experience in the role of Dean) was selected for the other vacant position as Chief Workforce Development Officer.

47. Harris was a required reference for the Chief Workforce Development Officer position. None of plaintiff's other references were contacted, which included former presidents and executives.

48. As a result of Bordonaro's promotion, she became the plaintiff's "direct line" manager while Harris remained as her "dotted line" manager.

49. Plaintiff also applied for the position of Associate Vice President of Student Success Management. Although qualified, she was not selected for the position.

50. Beginning in or about August 2020, Bordonaro and Harris took actions to remove responsibilities from plaintiff's position, diminish her position, and took actions intended to humiliate plaintiff.

8

51. Bordonaro and Harris transferred responsibility for the Financial Literacy (FIRST) Center, Career Services, and Extension Fund Programs – initiatives that plaintiff had created and successfully led – to other younger, less-qualified employees.

52. Harris modified contracts for plaintiff' staff without consulting her and excluded her from communications with her staff; he has also permitted other staff to give directives to plaintiff's staff.

53. Bordonaro and Harris ignored plaintiff's requests to serve on committees and projects and participate in professional development opportunities.

54. Bordonaro and Harris refused to provide plaintiff with requested documents that had been provided to other employees.

55. Harris actively discouraged other employees and external partners from communicating with plaintiff or seeking her assistance.

56. Harris informed plaintiff that other existing areas of responsibility in her position are or will be transferred to other employees.

57. Harris removed plaintiff's responsibility for managing recently awarded grants and assigned them to other staff members.

58. Bordonaro, as Chief Workforce Development Officer for Capital-East Region, scheduled the first meeting to discuss the regional plan for the operation of workforce development and continuing education – a meeting for which plaintiff would ordinarily have been expected to be present – for a date two days before the end of plaintiff's vacation. The selection of the date was made by Bordonaro and not based on the polling of attendees.

59. Bordonaro refused plaintiff's request to reschedule the meeting, even though it meant not only that plaintiff would not be present, but that she would not be able to prepare her own staff for the meeting.

60. Bordonaro also refused plaintiff's request to record the meeting and provide notes so that she could be aware of what transpired, even though she could not be present.

61. Bordonaro scheduled multiple meetings with the plaintiff's staff without informing and updating the plaintiff.

62. Bordonaro took actions to remove responsibilities from plaintiff's position, diminish her position, and took actions intended to humiliate plaintiff, including assigning projects directly to plaintiff's staff, giving her staff directions, excluding plaintiff from meetings, asking in meetings if plaintiff knew how to perform tasks that she had been doing for more than thirty years, and informing external partners not to communicate with plaintiff.

63. Bordonaro and Harris refused to adjust plaintiff's vacation time so she could respond to time sensitive and highly visible programs, that resulted in her working multiple days while on vacation.

64. Harris has made several references to the fact that the plaintiff does not engage in social media such as Facebook as an "age thing."

65. Defendant has repeatedly ignored plaintiff's safety concerns and has not followed required safety agreements due to the plaintiff's age discrimination complaint.

66. In or about October 2020, defendant rescinded plaintiff's annual salary increase.

## VI.     Count One: Age Discrimination in Employment (ADEA)

1. The plaintiff restates, re-alleges, and incorporates by reference paragraphs 1 through 66, above.

67. The defendant's treatment of the plaintiff, as described above, and including but not limited to failing to promote the plaintiff, removing her job responsibilities, assigning her menial tasks, interfering with her communication with her staff and with external partners, directing ageist comments at her, and disregarding her physical safety, was motivated by discriminatory animus on account of the plaintiff's age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. §621, *et seq.*

68. As a result of the defendant's discriminatory treatment of the plaintiff, she suffered and continues to suffer a loss of the wages and benefits of employment and extreme pain, suffering, and emotional distress.

69. The defendant's treatment of the plaintiff, as described above, was in willful violation of her rights under the Age Discrimination in Employment Act.

## VII.    Count Two: Retaliation for Opposing a Discriminatory Employment Practice (ADEA)

1. The plaintiff restates, re-alleges, and incorporates by reference paragraphs 1 through 69, above.

70. The defendant's treatment of the plaintiff, as described above, was motivated by discriminatory animus on account of the plaintiff's expressed opposition to the defendant's age-based discrimination, in violation of ADEA, 29 U.S.C. §623(d).

71. As a result of the defendant's retaliatory treatment of the plaintiff, she suffered and continues to suffer a loss of the wages and benefits of employment and extreme pain, suffering, and emotional distress.

72. The defendant's treatment of the plaintiff, as described above, was in willful violation of her rights under the Age Discrimination in Employment Act.

## VIII. Count Three: Age Discrimination in Employment (CFEPA)

1. The plaintiff restates, re-alleges, and incorporates by reference paragraphs 1 through 72, above.

73. The defendant's treatment of the plaintiff, as described above, was motivated by discriminatory animus on account of the plaintiff's age, in violation of the Connecticut Fair Employment Practices Act, Conn.Gen.Stat. §46a-60, *et seq.*.

74. As a result of the defendant's discriminatory treatment of the plaintiff, she suffered and continues to suffer a loss of the wages and benefits of employment and extreme pain, suffering, and emotional distress.

## IX. Count Four: Retaliation for Opposing a Discriminatory Employment Practice (CFEPA)

1. The plaintiff restates, re-alleges, and incorporates by reference paragraphs 1 through 74, above.

75. The defendant's treatment of the plaintiff, as described above, was motivated by discriminatory animus on account of the plaintiff's expressed opposition to the defendant's age-based discrimination, in violation of the Connecticut Fair Employment Practices Act, Conn.Gen.Stat. §46a-61(a)(4).

76. As a result of the defendant's retaliatory treatment of the plaintiff, she suffered and continues to suffer a loss of the wages and benefits of employment and extreme pain, suffering, and emotional distress.

**X.     Count Five: Discrimination or Retaliation for Exercise of Rights (FMLA)**

1. The plaintiff restates, re-alleges, and incorporates by reference paragraphs 1 through 76, above.

77. The defendant's treatment of the plaintiff, as described above, was motivated by discrimination and/or retaliation for the plaintiff's exercise of rights under the federal Family and Medical Leave Act, §29 U.S.C. §2615(a)(2) and §2615(b).

78. As a result of the defendant's discriminatory and/or retaliatory treatment of the plaintiff, she suffered and continues to suffer a loss of the wages and benefits of employment and extreme pain, suffering, and emotional distress.

## PETITION FOR RELIEF

WHEREFORE, plaintiff respectfully requests that the Court order the following relief:

1. Make the plaintiff whole, including by placing plaintiff in a position in defendant's employ to which she would have been promoted but for defendant's wrongful discrimination and/or retaliation;

2. Award plaintiff her economic losses, including lost wages and benefits of employment;

3. Award plaintiff compensatory damages, including damages for her pain, suffering, and emotional distress caused by the defendant's wrongful conduct;

4. Award the plaintiff double or liquidated damages, as provided by the Age Discrimination in Employment Act (ADEA) and Family and Medical Leave Act (FMLA);

5. Award the plaintiff her reasonable attorney's fees and costs; and

6. Such other relief as the Court deems appropriate.

**REQUEST FOR A JURY TRIAL**

The plaintiff respectfully requests a jury trial as to all of her claims to the extent that she is entitled by law.

RESPECTFULLY SUBMITTED
LINDA GUZZO,
THE PLAINTIFF, by

 / s / Peter Goselin
Peter Goselin ct06074
The Law Office of Peter Goselin
557 Prospect Avenue, 2nd Floor
Hartford, Connecticut 06105
Tel. 860-580-9675
Fax 860-232-7818
pdgoselin@gmail.com